UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
JALAL ABODALO,

                 Petitioner,         <u>MEMORANDUM AND ORDER</u>

    -v-                      <u>21-CV-1311 (JS)</u>

LYNN LILLEY,

                 Respondent.
------------------------------------X
APPEARANCES

For Petitioner:     Donna Aldea, Esq.
                  Barket Marion Epstein & Kearon, LLP
                  666 Old Country Road
                  Garden City, New York 11530

For Respondent:     Barbara Kornblau, Esq.
                  Nassau County District Attorney's Office
                  262 Old Country Road
                  Mineola, New York 11501


SEYBERT, District Judge:

        Following a jury trial in 2009,[1] Petitioner Jalal Abodalo

("Petitioner" or "Abodalo") was convicted of: one count of Course

---

[1] Petitioner's jury trial took place from August 12 to August 24, 2009. Trial transcripts of the state court trial and related proceedings are found in the Case Docket as follows:

| Proceeding | ECF No. |
|---|---|
| Jury Selection | 8-2 at ECF pp. 193-450 |
| Trial | 8-2 at ECF pp. 451-508; 8-3 at ECF pp. 1-204; 8-4 at ECF pp. 7-446; and 8-5 at ECF pp. 1-496 |
| Sentencing | 8-5 at ECF pp. 497-539 |

Hereafter, the consecutively paginated trial and sentencing transcripts will be referenced as "Trial Tr." and "Sent'g Tr." followed by the transcript's original page numbers.

of Sexual Conduct Against a Child in the First Degree (New York Penal Law ["Penal Law"] § 130.75); two counts of Aggravated Sexual Abuse in the Second Degree (Penal Law § 130.67); two counts of Sexual Abuse in the First Degree (Penal Law § 130.65); two counts of Sodomy in the First Degree (Penal Law § 130.50; and two counts of Incest in the Third Degree (Penal Law § 255.25). (Trial Tr. at 1297-1301.)

Presently, before the Court is Abodalo's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§ 2254") raising ineffective assistance of trial counsel as the sole ground for relief. (See Petition, ECF No. 2.[2]) Petitioner is presently in state custody, having been sentenced in 2009 to an aggregate term of seven-and-a-half to 15 years of imprisonment and five years of supervised release supervision.[3] Respondent, represented by

---

[2]  Hereafter, when pin-citing to the Petition, the Court will use the page numbers generated by the Court's Electronic Case Filing ("ECF") system.

[3]  The Court deems Petitioner to have satisfied the custody requirement of the federal habeas corpus proceeding. See Hensley v. Mun. Ct., San Jose Milipitas Jud. Dist., 411 U.S. 345, 351 (1973) (concluding a person is "in custody" for habeas purposes when such person is "subject to restraints not shared by the public generally"). The Court notes Petitioner was incarcerated and serving his sentence on the conviction he is challenging in the instant Petition when he filed the instant Petition in 2021. That sentence, imposed in 2009, included a five-year term of post-release supervision, which had not yet commenced because Petitioner was serving an additional, consecutive sentence of seven and one-half to 15 years of imprisonment, imposed on him following his June 28, 2018 conviction in a separate criminal case. (See Opp'n at ¶ 13.)

the Office of the District Attorney for Nassau County, opposes the Petition. (See Opp'n, ECF No. 8.) For the reasons articulated herein, the Petition is DENIED in its entirety, and the case is dismissed.

BACKGROUND

I.    The Offense and Petitioner's Arrest

In 2008, Petitioner's then-18-year-old nephew (hereinafter, "J.A."), disclosed to a girlfriend that he had previously been sexually abused by Petitioner, his paternal uncle. (Trial Tr. at 308-09, 313.) Subsequently, J.A. disclosed the abuse to his parents and law enforcement. (Id. at 317-21, 327-28.) Petitioner was arrested and charged by indictment in Nassau County, New York. He stood accused of sexually and physically abusing J.A., who was a minor at the time, over a period of seven years – from 1994, when J.A. was six-years-old, to 2001, when he turned twelve. (See State's Resp. to Request for Bill of Particulars & Discovery, ECF No. 8-2 at 138-142.) The charges were based upon multiple instances of abuse, including oral and anal sexual acts. (Id.)

From the time of his arraignment through the state court trial, Petitioner was represented by Dennis M. Lemke, Esq. ("Lemke").

II.  Petitioner's Trial and Sentence

        At the jury trial, the prosecution called seven witnesses: J.A.; J.A.'s parents; Kevin Moore ("Moore"), an attorney who spoke at J.A.'s high school about child sexual abuse; Edwin Trujillo, a detective working in Special Victims Squad, who interviewed J.A.; Dr. Bella Silecchia ("Dr. Silecchia"), a pediatrician and Director of the Suspected Child Abuse and Neglect Evaluation Program at the Nassau University Medical Center, who conducted a sexual abuse forensic examination of J.A. when he was 19-years-old; and Barbara Burkhard, a clinical psychologist.

        J.A. testified to the details of the abuse, providing specifics of each of the instances in which Petitioner was charged (see id. at 263-488.)  J.A. also stated Moore's presentation served as a catalyst for him to disclose the abuse to law enforcement. (Id. at 326-27.)  Trial testimony also disclosed that, when he was 11-years-old, J.A.'s mother took him to see a pediatrician and a pediatric gastroenterologist because he was experiencing rectal bleeding. (Id. at 665.)  Those medical records were admitted into evidence, but neither of those doctors testified at trial.  (Id. at 75.)  The medical records did contain any disclosure or suspicion of sexual abuse.  (Id. at 91-92.)  Nor was any sexual abuse forensic examination conducted at the time.  (Id.)

        The only medical evidence of the alleged abuse came though Dr. Silecchia, who testified she conducted a sexual abuse

4

forensic examination of J.A. on November 7, 2008, when he was 19-years-old, which was eight years after the alleged abuse. (Id. at 67-68.) For this exam, Dr. Silecchia utilized a colposcope, which enabled her to magnify and photograph the areas which she was examining. (Id. at 100-18.) Through this process, Dr. Silecchia observed two skin tags and, in-between them, a greyish-pink triangular-shaped accumulation of thick fibrous connective tissue (id. at 117); she testified this tissue mass was a scar left by a very deep tear, which she concluded was consistent with severe, penetrating trauma. (Id. at 111-14.)

Petitioner and his wife, Reem Abodalo, testified for the defense. (Id. at 788-909, 970-1112.) Their testimonies sought to establish that, on some of the dates J.A. claimed Petitioner had abused him, they were out of the country. In support of these claims, defense counsel introduced Petitioner's passports and a chronologic chart of the passports' stamps indicating when Petitioner entered and left the United States during the relevant timeframes. (See id. at 996, 998; see also Defense Trial Exs. L, M, N, O.) However, Petitioner's testimony also reflected he was in the United States on some of the dates, which were not shown by the stamps in any of his passports. (Trial Tr. at 1052-53.)

Petitioner also testified his relationship with his brother--who is J.A.'s father--deteriorated in 1999, and they did not speak again until August 2001; therefore, J.A. did not visit

5

Petitioner's home in April or May 2001. (Id. at 1029-30.) Petitioner denied ever sexually abusing J.A. (Id. at 1030-34, 1040.)

Defense also presented testimony of Chris McClung ("McClung"), a sexual assault forensic nurse examiner ("SANE"). (Id. at 909-966.) McClung testified she reviewed Dr. Silecchia's photographic slides but, while she observed the same tear as Dr. Silecchia, based on her review of J.A.'s full medical file, which included his prior medical records, McClung concluded the tear was caused by something other than sexual abuse, such as--possibly-- hemorrhoids or irritable bowel syndrome. (Id. at 925-32, 934, 952.) Coming to this conclusion, McClung pointed out that, in 2000, a gastroenterologist observed no tear but a hemorrhoid in the same location where Dr. Silecchia later found a scar. (Id. at 926-27, 962.)

After defense rested, the prosecution called Deep Chopra ("Chopra"), an officer with the U.S. Customs and Border Protection, and introduced records of border crossings by Petitioner. (Id. at 1118-54.) Notably, according to Chopra, all entries prior to 2001 were incomplete; because of that, it was impossible to confirm whether Petitioner was in the Country in December 1994, when, as J.A. testified, the abuse had first occurred, but during which time Petitioner insisted he was out of the Country. (Id. at 1124, 1127.)

The jury found Petitioner guilty on all counts, <u>to wit</u>:

<u>Count One</u>: Course of Sexual Conduct Against a Child in the First Degree (Sept. 1997; July 4, 1998; in Aug. 1998; week or weekend before Sept. 23, 1998; late winter/early spring weekend in 1999; Feb. 14, 1999; June 1999);

<u>Count Two</u>: Aggravated Sexual Abuse in the Second Degree (Dec. 31, 1994);

<u>Count Three</u>: Sexual Abuse in the First Degree (Dec. 31, 1994);

<u>Count Four</u>: Aggravated Sexual Abuse in the Second Degree (Summer 1996);

<u>Count Five</u>: Sexual Abuse in the First Degree (Summer 1996);

<u>Count Six</u>: Sodomy in the First Degree (Summer 1996);

<u>Count Seven</u>: Sodomy in the First Degree (Spring 2001);

<u>Count Eight</u>: Incest (Summer 1996); and

<u>Count Nine</u>: Incest (Spring 2001).

(<u>Id.</u> at 1297-1301.) On November 6, 2009, the court sentenced Petitioner to multiple concurrent terms of imprisonment with the longest sentence being seven-and-a-half to 15 years of incarceration followed by five years of post-release supervision. (Sent'g Tr. at 40-42.)

## III. <u>Direct Appeal</u>

Petitioner appealed his conviction and sentence. (Appellant Br., ECF No. 8-1.) On appeal, Petitioner argued his trial counsel was ineffective for failing to: conduct pre-trial

7

discovery; challenge medical and psychological testimony; call certain witnesses; and, introduce certain evidence. (Id. at 12-65.) Most of these claims concerned matters outside the record; recognizing this fact, Petitioner moved the Appellate Division, Second Department, to hold his appeal in abeyance while he prepared and filed a more appropriate collateral challenge pursuant to Criminal Procedure Law ("C.P.L.") § 440.10 in the lower state court. (ECF No. 8-8.) The Appellate Division denied Petitioner's motion, (ECF No. 8-10), and affirmed his conviction, finding the claims raised to have been "mixed", i.e., addressing matters on and outside the record, which was more suitable for a C.P.L. § 440.10 proceeding. People v. Abodalo, 100 A.D.3d 648, 952 N.Y.S. 2d 902 (App. Div. 2d Dept. 2012). Petitioner then sought leave to appeal to the Court of Appeals, first, the denial of his motion to hold the appeal in abeyance, and, second, the affirmance of the judgment of his conviction. (See ECF No. 8-12.) The Court of Appeals dismissed the first application and denied the second. See People v. Abodalo, 20 N.Y.3d 1095 (2013).

IV.  C.P.L § 440 Proceedings

        After the rejection of his direct appeal, Petitioner filed a C.P.L. § 440.10 motion seeking to vacate his judgment of

conviction.   (§ 440.10 Mot., ECF No. 8-16.)[4]   Petitioner claimed ineffective assistance of trial counsel and actual innocence.   (Id. at 19-136.)   With respect to ineffective assistance, he argued trial counsel: (1) failed to call certain alibi and fact witnesses, as well as failed to introduce documentary evidence which established Petitioner's innocence; (2) failed to investigate and conduct pre-trial discovery; (3) failed to (i) challenge medical and psychological testimony presented by prosecution and (ii) effectively cross-examine the prosecution's experts; and (4) failed to object to an impermissible outcry and bolstering testimony.   (Id.)   In support of his § 440.10 Motion, Petitioner submitted affidavits from multiple individuals claiming Petitioner was out of the Country on the dates when J.A. stated sexual abuse occurred.   (Exs. 3-13, 16-18, ECF No. 8-17.)   There were also affidavits from medical doctors, Dr. Jocelyn Brown and Dr. Vincent Palusci, submitted to dispute the findings presented at trial by Dr. Silecchia.   (Exs. 33, 34, ECF No. 8-22.)   Petitioner also presented an affidavit from McClung.   (Ex. 35, ECF No. 8-23.)

On Respondent's consent, the court ordered an evidentiary hearing (hereafter, the "Section 440 Hearing"), over which Justice Terese K. Corrigan presided (hereinafter, the

---

[4]  Petitioner's § 440.10 motion included multiple exhibits, all of which can be found in the Case Docket.  (See ECF Nos. 8-17, 8-18, 8-19, 8-20, 8-21, 8-22, 8-23.)

"Section 440 Court").   The Section 440 Hearing lasted 39 days, with the Section 440 Court sitting from April 14, 2015, to May 2, 2016.[5]   Petitioner presented 19 witnesses and 108 exhibits. Multiple witnesses were purported alibi witnesses who, according to Petitioner, trial counsel Lemke should have investigated and called to testify at trial.   However, at most, said alibi witnesses could testify to three of the charged instances of sexual abuse.

At the Section 440 Hearing, Yousef Al Haddad, Petitioner's business partner and friend, and Haddad's wife, Guity Dormishian, testified (remotely) that Petitioner was in Saudi Arabia on December 31, 1994, watching two of the Al Haddad children while Yousef and Guity travelled to Germany for the medical treatment of another of their children.   (440 Hr'g Tr. at 633-34, 640, 647, 658.)   This testimony contradicted J.A.'s trial testimony that Petitioner had first abused him on that date.   (See Trial Tr. at 367, 735-36.)

Petitioner's family friends, Said and Sima Tarzemi, also testified during the Section 440 Hearing, stating that on July 4, 1998, they were in Long Beach, New York, with Petitioner and his wife watching a firework show.   (440 Hr'g Tr. at 1078.)   This testimony contradicted the trial testimony that Petitioner had

---

[5]   The consecutively paginated transcripts of the Section 440 Hearing are available in the Case Docket and will be referred to hereinafter as the "440 Hr'g Tr."   (ECF Nos. 8-27, 8-28, 8-29, 8-30.)

sexually abused J.A. when he and his family visited Petitioner for the holiday weekend. (See Trial Tr. at 463.) At trial, J.A. also testified that when he told Petitioner he would tell his mother, Petitioner held him to a lit stove and threatened to burn J.A. on his rear end. (Id. at 248-49.)

Abdul Al Akel, Petitioner's brother-in-law (i.e., the brother of Petitioner's wife, Reem) and Abdul's wife testified (remotely) that, in September 1998, Petitioner attended their wedding in Jordan. (440 Hr'g Tr. at 965-66.) This testimony contradicted J.A.'s trial testimony that Petitioner forced him to perform oral sex about a week before his ninth birthday, which was on September 23, 1998. (See Trial Tr. at 256.)

Petitioner's other fact witnesses included: Joumana Abodalo, his sister; Inaya and Kanaan Shaath, family friends; Lisandra Estrada, a former tenant in Petitioner's house; and Gaetana Lorusso, a former health aide to Petitioner's mother. These witnesses provided testimony seeking to rebut some of the facts to which J.A. testified, such as whether there was a shed in the backyard of Petitioner's home and a counter in a downstairs bathroom, both locations where J.A. stated the sexual abuse took place. Similarly, in an attempt to rebut J.A.'s account that Petitioner's mother washed bloody sheets after one of the assaults, Petitioner proffered Lorusso, who opined as to whether

11

Petitioner's mother was capable of doing laundry.  (440 Hr'g Tr. at 708; see Trial Tr. at 266.)

At the Section 440 Hearing, Petitioner called two medical expert witnesses: Dr. Jocelyn Brown and Dr. Vincent Palusci, pediatricians with certifications in child sex abuse. (440 Hr'g Tr. at 571, 777.)  Their criticism of Dr. Silecchia included her failure to: conduct a peer review of her findings; consider a differential diagnosis to explain the abnormal findings, such as Crohn's disease; and palpate or conduct a biopsy of the abnormal tissue to confirm that it was indeed a scar.  (See, e.g., id. at 826, 1112-13, 1115.)  Yet, both experts admitted: Dr. Silecchia did palpate the tissue; and, neither of them would have conducted a biopsy--an invasive procedure--to determine whether a tissue is simply a scar.  (Id. at 826, 1124.)  Further, on cross-examinations, both experts conceded Dr. Silecchia's slides reflected abnormal findings, which findings did not exclude--and could be consistent with--the sexual abuse.  (Id. at 879-80, 1124.)

Petitioner also presented testimony from the two doctors, Dr. Moffitt and Dr. Kelly, who had examined J.A. in 2000, but did not notice any abnormalities such as the presence of any anal tears.  (Id. at 2034-35, 2063.)  Both doctors confirmed there was no disclosure of sexual abuse, and they had not examined J.A. in a chest-prone position with a colposcope, as Dr. Silecchia had.

12

Petitioner called McClung to testify at the Section 440 Hearing, i.e., the same SANE nurse who testified as an expert for Petitioner at trial. (Id. at 340-568.)  At the said Hearing, McClung testified to feeling she had not been properly prepared by Petitioner before his trial, but that she had not advised Petitioner's trial counsel of that fact; yet, she also stated defense counsel provided her with the medical records and colposcopy slides from Dr. Silecchia, and she discussed her testimony with defense counsel in person and via telephone. (Id. at 360,385, 491-94, 501-03, 559-60.)  McClung further testified about having testified as an expert on 60 prior occasions, including for Petitioner's trial counsel in an unrelated case. (Id. at 560-61.)  Additionally, McClung stated she was trained, experienced, and capable of reviewing Dr. Silecchia's slides and testifying as to the findings. (Id. at 560.)  Lastly, McClung disclosed, since Petitioner's trial, she had had seven surgeries and chemotherapy, which may have affected her memory. (Id. at 564.)

Finally, Petitioner called Dr. John Yuille, a forensic psychologist, who opined the police had not follow established guidelines when interviewing J.A. (Id. at 2403-50.)  Dr. Yuille testified child victims of sexual assault have so-called "script memory", remembering the general way sexual abuse occurs, but not individual episodes unless those episodes would not be part of a

pattern.   (Id.)   Dr. Yuille did not partake in the police's interview of J.A.; nor is there any trial testimony regarding the manner in which said interview was conducted, which was not recorded.

Respondent presented testimony from three witnesses: (1) Michael Tangney, the Long Beach Commissioner of Police; (2) Carla Abodalo, J.A.'s mother; and, (3) trial counsel Lemke.   First, Commissioner Tangney testified there was no firework display in Long Beach on July 4, 1998; this testimony contradicted the testimony of Said and Sima Tarzami that Petitioner was with them on that date in Long Beach watching the fireworks show.   (Id. at 3353-93.)   Second, Carla Abodalo testified J.A. never suffered from the Crohn's disease or any inflammatory or irritable bowel syndrome, all possible differential diagnoses Petitioner's experts opined could have explained the abnormal findings by Dr. Silecchia. (Id. at 3023-24.)

Finally, Petitioner's trial counsel, Lemke, testified extensively regarding his representation of Petitioner in Petitioner's underlying criminal case.   Lemke explained he became involved in the case after receiving a call from Petitioner's wife, following Petitioner's arrest in October 2008.   (Id. at 2456.) Lemke met with the wife before Petitioner's arraignment and bail hearing, after which he encouraged her to bring more family members to the courtroom as a show of support for Petitioner. (Id. at 2458-

14

59.)    However, Petitioner's wife came to court alone and was adamant about not wanting anyone to know about the charges.  (Id. at 2459.)    After securing Petitioner's release on bail, Lemke recounted, he then regularly met and conversed about the case with Petitioner and his wife.    (Id. at 2489.)    Lemke testified Petitioner was also adamant that neither family members nor his friends learn about the charges, even if Petitioner would not then be able to call these people as witnesses to substantiate his claims of having been out of the Country on the dates of alleged abuse. (Id. at 2567.)    Lemke further testified of his repeatedly and strongly advising Petitioner against this approach and telling Petitioner it was "foolish" to not provide Lemke with the names and contact information of these possible defense witnesses.  (Id.) And, upon cross-examination, Lemke again explained he was not provided any additional names of individuals to whom he could speak about the allegations; he elucidated:

> The conversations that I had with Jalal . . . and Reem regarding these allegations and as much as I impressed upon him the seriousness of these allegations and that the more witnesses that would be relevant which would be helpful to this defense was not readily accepted by Jalal and Reem because they wanted it very limited as to who would find out or who would know about not only these allegations but that a brother would bring this laundry, as they referred to it, in the open.

(440 Hr'g Tr. at 3278.)

15

Additionally, Lemke testified that, from Petitioner he knew, from November 1994 through March 1995, Petitioner and his wife were in Saudi Arabia watching over Al Haddad's children while the latter and his wife travelled to Germany with one of their children for medical treatment. (Id. at 2574-77.) Lemke asked Petitioner to contact Al Haddad, which Petitioner said he did, but then Petitioner told Lemke that Al Haddad did not recall whether Petitioner left Saudi Arabia and returned to the United States within the timeframe when Petitioner and his wife were watching over Al Haddad's children. (Id.; see also id. at 2581.) Lemke stated that it was "mostly" Petitioner who decided not to call Al Haddad as a witness. (Id. at 2577-78.)

With respect to Petitioner's medical expert, McClung, Lemke testified he retained P.J. West and Associates ("P.J. West"), whose services he previously utilized, to aid in interpreting the medical findings of the case. (Id. at 2513-2516.) He explained he consulted with P.J. West, reviewing the medical records and the slides, to assist him in developing a strategy for challenging the evidence and cross-examining Dr. Silecchia. (Id.) Also, it was through P.J. West that Lemke was introduced to McClung, who had successfully testified for Lemke in an unrelated previous trial, and who the defense called on behalf of Petitioner. (Id. at 2514.) Lemke testified that upon the review of the slides with McClung, he developed a two-fold strategy: first, he would seek to establish

16

that, if the colposcopic findings were related to the sexual abuse, those findings would have been observed by the doctors who examined J.A. in 2000; and second, he would seek to establish that there was other explanations other than sexual abuse for the abnormal findings, such as irritable or inflammatory bowel disease. (Id. at 2533.)

After the conclusion of the Section 440 Hearing and upon receipt of the parties' post-hearing memoranda of law (ECF Nos. 8-31, 8-32), the Section 440 Court issued its decision partially vacating Petitioner's conviction on the grounds of established actual innocence, but denying all ineffective assistance claims. (See July 28, 2016 Section 440 Court Order ("440 Court Order"), ECF No. 8-33.) Specifically, with respect to Petitioner's ineffective assistance claims, the Section 440 Court credited Lemke's testimony in its entirety (id. at 3); it found Lemke's performance in the underlying trial was not ineffective, and his representation of Petitioner was "both objectively reasonable and meaningful." (Id. at 8, 12.)

The Section 440 Court's finding that Petitioner's trial counsel was not ineffective was supported by many findings of fact. For example, the Section 440 Court found Petitioner played a substantial role in preparing his potential alibi defense, even though "he was reluctant to provide Mr. Lemke the names and contact information of individuals who could provide alibi information as

17

[Petitioner] did not want anyone outside of his immediate family to know of the charges against him." (Id. at 5.) Indeed, the Section 440 Court noted: "Numerous witnesses testified at this hearing that they were not made aware of the charges against [Petitioner] until after he was convicted and only in relation to this current motion before the Court." (Id. at 5 n.10.) Moreover, with Petitioner's accent, because Al Haddad could not confirm Petitioner did not leave for the United States in December 1994, Lemke decided to rely upon documentary proof that Petitioner did not enter the Country. (Id. at 5.) Instead of calling Al Haddad, a chronologic overview of the stamps in Petitioner's passports was created and presented to the jury. (Id.) The Section 440 Court also found Lemke made a strategic choice, agreed to by Petitioner, not to call any U.S. Customs and Border Protection witnesses regarding Petitioner's presence, or not, in the Country after being "advised that prior to September 11, 2001, record keeping was sub-par and thus it would not be beneficial to the defense to have a witness cast doubt on the travel information already received by defense." (Id.)

Continuing, the Section 440 Court found Lemke presented documentary proof of Petitioner's absence from the United States where it was available, but it was Petitioner himself who prevented Lemke from contacting and calling witnesses who would be able to corroborate this timeline. (Id. at 6.) It reiterated it was

18

Petitioner who "continued to insist that no-one be called as [Petitioner] did not want the allegations shared with others." (Id.)  Relatedly, Lemke discussed the possibility of calling Petitioner's father (who was also J.A.'s grandfather) to testify; ultimately, because of the father's anger of the allegations against Petitioner having been shared outside of the family, which was "a position that was not advantageous to" Petitioner, it was determined the father would not be called.  (Id.)

The Section 440 Court discussed Lemke's defense strategy of putting forth "a motive related to family embarrassment over Petitioner paying off a debt for J.A.'s father," which was considered "a significant slight in [Petitioner's] culture." Lemke sought to present a defense that J.A. made false allegations of sexual abuse "in retaliation for this slight."  (Id. at 6-7.) He would use Petitioner's travel documents to both show Petitioner's alibi and call in question J.A.'s credibility.  (Id. at 7.)  Overall, the Section 440 Court stated:

> Mr. Lemke sought an opportunity to call alibi witnesses; [Petitioner] hampered Mr. Lemke's ability to do so and was told by Mr. Lemke that such actions were "foolish."  That Mr. Lemke's words proved true does not now mean that [Petitioner] can say he was ineffective.

(Id. at 10 (citation omitted).)

As to medical records and experts, the Section 440 Court found Lemke pursued the exact strategy Petitioner claimed Lemke

should have pursued, i.e., he sought to cast doubt on Dr. Silecchia's findings supporting J.A.'s sexual abuse allegations and to provide an alternative explanation for the presence of the anal scarring. (Id. at 9.) Because both of Petitioner's experts provided equivocal testimony about the possible origins of the anal scar, the Section 440 Court found such testimony "d[id] not equate with the finding of ineffectiveness in the manner in which Mr. Lemke handled the situation," namely relying on his chosen expert whose credentials and qualifications he had no reason to question. (Id.)

Nonetheless, based upon clear and convincing documentary evidence and certain witness testimony, the Section 440 Court also found Petitioner was "actually innocent of certain charges against him as he was not in the United States on the dates as outlined by the prosecution", i.e., the week/weekend before September 23, 1998 (as relevant to the Count One), and December 31, 1994 (as relevant to Counts Two and Three). (Id. at 12-13.) Because charges in Counts Two and Three were based solely upon allegations of the sexual abuse occurring on December 31, 1994, the Section 440 Court ordered them dismissed. (Id. at 18.) Having found Petitioner innocent of one of the allegations underlying the charges in the Count One, the Section 440 Court nevertheless let the conviction on Count One stand as September 1998 was only one of many instances charged under that Count. (Id.) The Section 440 Court stated:

20

> [M]uch of the testimony received at the [] 440
> Hearing casts some doubt on [Petitioner]'s
> guilt on those counts for which the Court has
> not found him actually innocent.  However,
> such doubt, or even a preponderance of
> conflicting evidence as to [Petitioner]'s
> guilt, is insufficient for the Court to make
> a finding of actual innocence.  In fact, this
> Court does not believe [Petitioner] is
> completely innocent of the charges against
> him.  The child complainant, who was a
> teenager at the time he revealed the abuse,
> initially discussed the many instances of
> sexual abuse based on his best recollection,
> the events surrounding the abuse and his
> general age.  After meeting with the District
> Attorney's office, specific dates were
> connected to specific acts of abuse.  It is
> clear from the evidence at this [440 H]earing
> that certain of those dates correspond to the
> time when [Petitioner] was not in the United
> States.  <u>The Court does not find that this
> issue is one of credibility as it relates to
> the complainant.</u>

(<u>Id.</u> at 17 (internal citation omitted; emphasis added).)  The

Section 440 Court explicitly stated it made its findings of actual

innocence "[i]rrespective of [its] finding regarding Mr. Lemke's

representation."  (<u>Id.</u> at 12.)

V.   <u>Resentencing and Appeal</u>

    Since the Section 440 Court dismissed two counts of

Petitioner's conviction and made a finding of actual innocence in

relation to one instance charged in a third count, Petitioner was

resentenced, and a new judgment of conviction was issued.

(Resent'g Tr., ECF No. 8-34.)  At resentencing, the state court

vacated Counts Two and Three and the related sentences; the

21

sentence on all remaining counts, including Count One, remained in place. (Id. at 4.) Since it was Count One that carried the longest prison sentence of seven-and-one-half to 15 years, and with all imposed sentences having been concurrent, the vacated counts had no effect on Petitioner's total term of imprisonment.

Petitioner then sought, and was granted, leave to appeal the Section 440 Court's denial of his claims of ineffective assistance of counsel and the denial to vacate the judgment. (Leave Appl., ECF Nos. 8-35, 8-36, 8-37, 8-38, 8-39.) On appeal, Petitioner argued the Section 440 Court should have applied a lower standard, i.e., preponderance of the evidence, to the remaining counts of the indictment, once it had made a determination by clear and convincing evidence with regards to the instances charged under Counts One, Two, and Three. (Appellant § 440 Appeal Br., ECF No. 8-42, at 130-35.) He also claimed the Section 440 Court misapplied and/or misapprehended the law when it found trial counsel Lemke not ineffective. (Id. at 17-129.) Respondent opposed Petitioner's argument. (Respondent § 440 Appeal Opp'n, ECF Nos. 8-43, 8-44). The Appellate Division affirmed the Section 440 Court ruling, agreeing that Petitioner failed to establish he was denied effective assistance of counsel because:

> [he] did not demonstrate the absence of strategic or other legitimate explanations for, inter alia, certain individuals not being called as witnesses, not obtaining certain documentary evidence, and the manner in which

> trial counsel rebutted the People's medical
> evidence.   The record showed that certain
> witnesses were unwilling to testify or, in any
> event,   were   unable   to   confirm   that
> [Petitioner] was not in the United States at
> the time that some of the incidents occurred
> (see People v. Stewart, 248 A.D.2d 414, 414),
> while the identities of others were unknown to
> trial counsel since [Petitioner] did not want
> anyone   beyond   a   very   small   group   of
> individuals to know of the allegations which
> he deemed to be embarrassing for him and his
> family (see People v. Hamilton, 272 A.D.2d
> 553, 554).  In addition, [Petitioner] failed
> to demonstrate that his trial counsel was
> ineffective   for   not   introducing   certain
> documentation   into   evidence   at   trial.
> Moreover, [Petitioner] did not demonstrate
> that trial counsel's decision to rebut the
> People's medical evidence through testimony
> from a sexual assault nurse examiner and to
> present   an   alternative   theory   for   the
> existence of the medical findings was anything
> more than a disagreement with trial tactics
> and strategies (see People v. Guay, 72 A.D.3d
> 1201, 1204, aff'd 18 N.Y.3d 16).

People v. Abodalo, 189 A.D. 3d 1607, 1608-09, 138 N.Y.S.3d 149

(App. Div. 2d Dept. 2020).   The Appellate Division ruled

Petitioner's remaining contention was unpreserved and meritless.

See id. at 1609.  Petitioner then unsuccessfully sought leave to

appeal to the Court of Appeals, raising the same arguments as

before the Appellate Division. (ECF Nos. 8-46, 8-47.)  See People

v. Adodalo, 36 N.Y.3d 1094 (2021).

VI.  Procedural History

        Petitioner timely filed the instant Petition seeking

federal habeas corpus relief based upon his claims of ineffective

assistance of counsel.  (Pet., ECF No. 2.)  Respondent opposed the Petition.  (Opp'n, ECF No. 8.)  Petitioner filed a Reply, in which he elaborated on his claims of ineffective assistance of counsel. (Reply, ECF No. 10.)

DISCUSSION

I.   The Applicable Law

A. Section 2254 Standard of Review

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States."  Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002).  Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas court, when considering a claim that was decided on the merits in a state court proceeding, may grant relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or" (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant

24

state-court decision applied clearly established federal law
erroneously or incorrectly.  Rather, that application must also be
unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000); see
also McBride v. Perez, No. 13-CV-4792, 2015 WL 5245072, at *8
(S.D.N.Y. June 25, 2015) ("'[I]t is not the province of a federal
habeas court to reexamine state-court determinations on state-law
questions.  In conducting habeas review, a federal court is limited
to deciding whether a conviction violated the Constitution, laws
or treaties of the United States.'") (quoting Estelle v. McGuire,
502 U.S. 62, 67-68 (1991)).  The requirements set forth by the
AEDPA are strictly construed and, by design, establish a barrier
to federal habeas relief founded upon the principle that "[s]tate
courts are adequate forums for the vindication of federal rights"
and are "presumptively competent[] to adjudicate claims arising
under the laws of the United States." Burt v. Titlow, 571 U.S.
12, 19 (2013) (internal quotation marks and citation omitted).

Under § 2254(d)(1), a state court decision is considered
"contrary to" federal law if it either "applies a rule that
contradicts the governing law set forth in [the Supreme Court]
cases" or "confronts a set of facts that are materially
indistinguishable from a decision of [the Supreme Court] and
nevertheless arrives at a result different from [the Supreme Court]
precedent." Williams, 529 U.S. at 405-06.  "'Clearly established
Federal law' means 'the holdings, as opposed to the dicta, of [the

Supreme] Court's decisions as of the time of the relevant state-court decision.'" Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (quoting Williams, 529 U.S. at 412 (alteration in original)). By contrast, an "unreasonable application" of federal law occurs where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407-08. "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." White v. Woodall, 572 U.S. 415, 427 (2014) (internal quotation marks and citations omitted).

Furthermore, a state court's determinations of factual matters are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." Lynn, 443 F.3d at 246-47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule the state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal

26

constitutional right has been violated." Williams, 529 U.S. at 389.

While a habeas petition will not be reviewed by the district court unless "the applicant has exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), since all claims in the instant Petition were previously fully presented to the state courts and rejected by them on the merits, Petitioner's claims are fully exhausted. Therefore, in this instance, the Court need not discuss the procedural bar standards in the federal habeas review context.

B. Ineffective Assistance of Counsel Standard

Strickland v. Washington sets forth the relevant federal law governing claims of ineffective assistance of counsel. 466 U.S. 668 (1984). To prevail, a petition must establish (1) the "counsel's performance was deficient" and (2) "that deficient performance prejudiced the defense." Id. at 687. To make out a successful claim, both Strickland factors must be satisfied; a reviewing court is not required to "even address both components of the inquiry if the [petitioner] makes an insufficient showing on one." Id. at 697.

As to the Deficient Performance Factor: "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Harrington v. Richter, 562 U.S. 86, 104 (2011)

(quoting Strickland, 466 U.S. at 688).  In evaluating this prong, "the court must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time,' and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689).  Furthermore, "'[t]he failure of a lawyer to invoke meritless objections cannot constitute constitutionally deficient performance.'"  Parks v. Sheahan, 104 F. Supp. 3d 271, 285 (E.D.N.Y. 2015) (quoting Hicks v. Ercole, No. 09-CV-2531, 2015 WL 1266800, at *23 (S.D.N.Y. Mar. 18, 2015)).

As to the Prejudice Factor:  To make a sufficient showing of prejudice, a petitioner:

> must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.

Strickland, 466 U.S. at 694.

Furthermore, the "highly deferential <u>Strickland</u> standard is made doubly so on habeas review, as AEDPA requires deference to the state court's ruling." <u>Bogan v. Brandt</u>, No. 11-CV-1550, 2017 WL 2913465, at *9 (E.D.N.Y. July 6, 2017) (internal quotation marks and citations omitted). "Bearing this deferential standard in mind, it is unsurprising that 'the great majority of habeas petitions that allege constitutionally ineffective counsel' fail." <u>Miller v. LeClair</u>, No. 20-CV-1546, 2024 WL 1797341, at *12 (E.D.N.Y. Apr. 25, 2024) (quoting <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001)).

## II.  <u>Application</u>

Petitioner challenges his state court conviction and sentence on a sole ground that he received ineffective assistance of counsel. (Pet. at 5.) Specifically, he raises three claims of ineffective assistance, <u>to wit</u>, that counsel failed to: (1) investigate and present alibi witnesses and supporting evidence "to demonstrate the implausibility, if not impossibility, of virtually all of complainant's accusations"; (2) prepare for and challenge the prosecution's medical evidence; (3) investigate or elicit evidence to challenge J.A.'s credibility and provide another explanation for any physical findings presented to the jury. (<u>Id.</u>) Petitioner argued all of these claims earlier, twice, in state court, <u>i.e.</u>, on direct appeal and via his Section 440 Motion. And, Petitioner's Section 440 Motion was the subject of

29

an extensive evidentiary hearing, during which the 440 Court heard from the array of Petitioner's witnesses, as well as his former trial counsel, Lemke.  The 440 Court denied all of Petitioner's ineffective assistance claims, explicitly finding Lemke was not ineffective under both New York and Strickland standards.

In opposition, Respondent argues Petitioner's ineffective assistance claims, advanced in the state courts and rejected on the merits, do not pass the double deferential AEDPA standard and do not present an unreasonable application of the Strickland standard.  (Opp'n at 3-21.)  The Court addresses each claim in order.

A.    Alleged Failure to Investigate and Call Witnesses

Petitioner claims Lemke failed to investigate and call witnesses at trial.  (Pet. at 5; Reply at 5-8.)  He further argues Lemke should have called the witnesses who testified for Petitioner at the 440 Hearing and, at that Hearing, provided information about his alibi.  (Reply at 5-8.)  Respondent counters that the 440 Court reasonably determined Lemke could not have called witnesses of whose existence he was unaware because his client, Petitioner, refused to divulge their names and contact information to him.  (Opp'n at 5-11.)  In reply, Petitioner contends, "based on the record, the state courts' findings that Lemke was hamstrung by his client from calling alibi witnesses was 'an unreasonable

determination of facts.'" (Reply at 6 (citing 28 U.S.C §
2254(e)(1); <u>Wood v. Allen</u>, 558 U.S. 290, 297 (2010)).)

Petitioner's argument is unavailing. The record
demonstrates Lemke had numerous conversations with Petitioner
about alibi witnesses. While Petitioner identified some of these
witnesses, he did not provide Lemke with the contact for any of
them besides his father, who, as both Petitioner and Lemke decided,
would not have been an effective defense witness. (<u>See</u> 440 Hr'g
Tr. at 2618-20, 3261.) Moreover, as to Al Haddad, who Petitioner
identified as a potential alibi witness, Lemke reasonably
questioned his value as a defense witness because Petitioner told
Lemke that Al Haddad could not confirm with certainty Petitioner
had not returned to the United States in December 1994, as would
have been relevant to establish an alibi for December 31, 1994.
That questionable value led to a decision to put in documentary
evidence, as well as Petitioner's and his wife's testimonies,
instead. (<u>Id.</u> at 2575-81.)

While Petitioner's argument is that "everyone was
talking about the allegations" prior to trial, as one of
Petitioner's family friends testified (<u>id.</u> at 1699-1700; <u>see also</u>
Reply at 6), this does not contradict Lemke's testimony that
Petitioner refused to divulge names of possible witnesses to him
and wanted to keep the circle of those involved in the trial small.
Indeed, no contrary evidence was offered during the 440 Hearing to

undermine Lemke's testimony regarding Petitioner's insistence of not divulging names of possible witnesses other than Al Haddad and Petitioner's father and sister.

As such, upon its independent review of the evidence presented below, this Court finds the state court's findings of facts were not unreasonable with respect to the possible alibi witnesses and Petitioner's own shortcomings in not disclosing those witnesses' identities to his counsel. Lemke's testimony that he was hamstrung by his client's "foolish" decision not to disclose the identities of potential witnesses is not contradicted by the fact that some of the 440 Hearing witnesses had found out independently about the charges. And, despite some witnesses having testified to knowing about the charges and being available to testify if called, that does not negate Lemke's decision to pursue a strategy to discredit J.A. without involving individuals outside of the family, i.e., the strategy upon which Petitioner insisted and which he was very involved in developing. (See id. 2553, 2566-67.)

To the extent Petitioner also argues Lemke was deficient in his performance by failing to call, not only the Arabic-speaking witnesses from out-of-Country, but also those who were in-Country, spoke English, possessed information relevant to the allegations, and were available to testify, upon the record presented, said argument is without merit. (Reply at 7-9.) Testimony given at

32

the 440 Hearing by these potential witnesses undergirds Lemke's assertion that Petitioner never provided him with the names of said potential witnesses. Several witnesses were asked whether they were aware of charges against Petitioner before the trial and/or contacted by Lemke, to which they responded in the negative. (See, e.g., 440 Hr'g Tr. at 132-33 (Lisandra Estrada), 155-56 (David Said Tarzami), and 256 (Sima Tarzami).) Lemke himself confirmed that neither Petitioner nor his wife had made Lemke aware that these persons were potential witnesses. (See id. at 2622, 2626, 2629, 2631.) Furthermore, Petitioner's representation to Lemke that his sister would not agree to testify so as to avoid taking sides of one brother over another (see id. at 2634), and that Al Haddad was unable to confirm Petitioner was in Saudi Arabia and did not leave for the United States at a relevant time, (see id. at 2576), further supports the 440 Court's reasonable finding that Lemke did not fail to investigate or call them but was prevented from doing so by Petitioner. See, e.g., Strickland, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); cf. Garcia v. Portuondo, 459 F. Supp. 2d 267, 286 (S.D.N.Y. 2006) (finding counsel's performance deficient where counsel was in possession of

alibi documents, knew of witnesses ready to testify, but failed to undertake any investigation).

In sum, as he failed before the 440 Court, here, in the absence of clear and convincing evidence, Petitioner fails to show Lemke's performance was deficient for failing to call witnesses of whom he was unaware given Petitioner's own representations and actions; therefore, this Court finds the 440 Court was not unreasonable in finding Petitioner's ineffective claim failed under Strickland.  Cf. Caballero v. Miller, No. 18-CV-5108, 2024 WL 4231760, at 27-28 (E.D.N.Y Sept. 19, 2024) (finding ineffective assistance established under Strickland where the record established petitioner's trial counsel did not interview any witnesses despite knowing their identities and the potential importance of their testimonies).  Because Lemke's performance here was not constitutionally deficient, the Court need not make a prejudice determination.

B. Alleged Failure to Prepare and Challenge Medical Evidence

Petitioner claims Lemke failed to adequately prepare and lodge a challenge to the medical evidence presented in this case. (Pet. at 5.)  More specifically, he argues Lemke was deficient in his performance for failing to consult with a qualified medical expert to understand the science and challenge the prosecution's evidence and expert witness.  (Reply at 10-17.)  Petitioner's position is that Lemke improperly utilized the services of a SANE

34

nurse, instead of a medical doctor, to rebut Dr. Silecchia's testimony regarding a scar J.A. had, i.e., that it was a consequence of sexual abuse by anal penetration. (Id. at 11-12.) Respondent argues that Lemke made an effective and diligent challenge to the medical findings. (Opp'n at 12-20.) That is precisely what the 440 Court found:

> [Lemke] consistently argued that the medical findings were NOT the result of sexual abuse by [Petitioner]. There is nothing in the record that shows that Mr. Lemke would have been more successful at trial by calling a medical doctor to contradict the findings of Dr. Silecchia. There is nothing in the record that shows that this decision was so egregious and prejudicial as to deny [Petitioner] a fair trial.

(440 Court Order at 9.)

In support of his position that Lemke's performance was deficient under the first prong of Strickland, Petitioner cites Gersten v. Senkowski, 299 F. Supp. 2d 84 (E.D.N.Y. 2004), which was affirmed by the Circuit Court, see 426 F.3d 588 (2d Cir. 2005). (See Reply at 10-13). In Gersten, Lemke was the trial counsel whose ineffectiveness was challenged by a habeas petitioner. See Gersten, 299 F. Supp. at 96. In that sexual assault case, the district court found Lemke to be ineffective because he failed to consult with, and call to testify, a medical expert to challenge the prosecution's presentation of medical expert testimony from Dr. Silecchia, who--like here--testified to finding, among other

35

things, anal tearing through the use of a colposcope.  See id. at 102-104.   In affirming the district court, the Second Circuit underscored, "defense counsel failed to call a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse."  Id. at 608.

Petitioner's reliance upon Gersten is misplaced; here, "[u]pon receipt of medical records and other medical evidence, Mr. Lemke reached out to a medical consulting firm that he previously utilized to obtain an understanding of that evidence."  (440 Court Order at 8 (stating further "[n]o information existed that called into question the abilities and services" of the medical consulting firm).)  Hence, Petitioner's contention that Gerstein's facts and holding squarely apply here is inaccurate.   Contrary to Gersten, where the Circuit Court found it "particularly troubling" that Lemke failed to examine the colposcopic files, or even request them, in this instance, Lemke requested and received Dr. Silecchia's findings and colposcopic slides, as well as consulted with a medical consulting firm and retained an expert to challenge those findings and slides at trial.   The fault the Gersten courts found with Lemke, warranting a finding of ineffectiveness, is simply not present in this case.[6]  (See 440 Court Order at 9.)

---

[6]  Petitioner also claims Lemke was ineffective by not disclosing the "conflict of interest" that prevented Lemke from effectively

Moreover, while it is true McClung, the defense medical expert in this case, was a SANE nurse and not a medical doctor, Lemke presented her testimony at trial in pursuit of the same strategy Petitioner asserts Lemke should have been pursuing all along, i.e., challenging the prosecution's medical evidence. (Compare 440 H'g Tr. at 2649-50, with Reply at 15.)  Acknowledging some abnormal findings in the slides, McClung opined that, based upon a full review of J.A.'s medical file and history, as well as that no troubling findings were made during the 2000 examinations, the abnormalities seen in Dr. Silecchia's slides were likely a result of hemorrhoids or inflammatory or irritable bowel syndrome. (See Trial Tr. at 964.)  There is "nothing in the record that shows that Mr. Lemke would have been more successful at trial by calling a medical doctor to contradict the findings of Dr. Silecchia." (440 Court Order at 9.)  Moreover, the Supreme Court has made clear Strickland does not require that "for every prosecution expert an

---

cross-examining Dr. Silecchia with respect to her adjudicated lack of expertise in Gersten.  However, Petitioner does not cite any authority to support this proposition.  Further, it does not appear such perceived conflict required either disclosure of such to his client, the court, or rendered Lemke incapable of diligently representing Petitioner and vigorously challenging Dr. Silecchia on cross-examination.  Cf. Arevalo v. Lee, No. 19-CV-6962, 2024 WL 4694005, at *1-2 (E.D.N.Y. Nov. 6, 2024) (finding conflict of interest affected counsel's representation, thereby sufficiently implicating Strickland, where counsel failed to disclose to his client and the court that, at the time of client's criminal proceedings, counsel himself was being investigated and prosecuted by the same District Attorney's office).

equal and opposite expert from the defense" be presented. <u>Harrington</u>, 562 U.S. at 111.

In that vein, like the Section 440 Court, this Court finds the testimony of Drs. Brown and Palusci also fails to establish Lemke's ineffectiveness as it pertains to Petitioner's medical-evidence-based claim; neither doctor was unequivocal that the observed abnormality in the colposcopic slides was not a scar and could not be indicative of the sexual abuse to which J.A. alleged the Petitioner subjected him. (440 Court Order at 9.) Like McClung's testimony, the testimony of Drs. Brown and Palusci at the Section 440 Hearing can be said to call into doubt that of Dr. Silecchia; but, it did not "completely refute[] the prosecution's physical evidence purportedly showing forced sexual penetration of the child-victim." <u>Englert v. Lowerre</u>, 115 F.4th 69, 87 (2d Cir. 2024) (citing <u>Gersten</u>, 426 F.3d at 611-12.) Therefore, the state court's determination that Lemke's pursuit of medical evidence was not "so egregious and prejudicial as to deny [Petitioner] a fair trial" (440 Court Order at 9) was not unreasonable. <u>See, e.g.</u>, <u>Englert</u>, 115 F.4th at 87. And, Petitioner falls "short of establishing the substantial likelihood of a different result necessary to demonstrate prejudice." <u>Harrington</u>, 562 U.S. at 112.

In sum, upon close examination of the present record, this Court finds the 440 Court's findings of fact were reasonable;

Petitioner has not presented clear and convincing evidence to rebut this presumption.  The Court does not find that Petitioner's trial counsel was ineffective in his challenge of the medical evidence in this case.  As is required under AEDPA, deferring to the state court's determination, including its assessment of counsel's testimony at the Section 440 Hearing, the Court finds, pursuant to <u>Strickland</u>, Lemke's performance was neither constitutionally deficient nor caused Petitioner to be prejudiced.

C. <u>Alleged Failure to Investigate and Elicit Evidence Challenging the Complainant's Credibility</u>

Finally, Petitioner claims Lemke was ineffective because he did not seek to investigate and properly challenge J.A.'s credibility and provide any alternative explanation to relevant physical findings.  (Pet. at 5.)  Petitioner asserts the state court failed to address Lemke's shortcomings, which he contends constituted deficient performance, when Lemke allegedly failed to conduct an investigation in J.A.'s sexual history, including whether J.A. had engaged in homosexual acts.  (Reply at 16-17.) While Respondent did not address this claim, the Section 440 Court made a finding of fact that Lemke "did not question [J.A.] about engaging in homosexual acts as he had no reason to believe he had and would not alienate the jury by raising an issue that had little support in evidence."  (440 Court Order at 7.)

Indeed, the only evidence suggesting J.A. could have been homosexual and sexually active in that manner came from Facebook photographs presented by Petitioner as part of § 440 proceedings. (See Ex. 37, ECF No. 8-23, at 21-47.) At the Section 440 Hearing, Petitioner did not present any other witnesses that would have supported a theory that J.A. was homosexual or engaging in homosexual relations. In fact, Carla Abodalo, J.A.'s mother, testified to the opposite: J.A. was known to be a "Casanova" and had a girlfriend. (See 440 Hr'g Tr. at 3182.) Nor did the medical records, including the examination by Dr. Silecchia, provide any information J.A. was engaging in homosexual acts; instead, Dr. Silecchia noted J.A. represented to her that he was sexually active with women. (See id. at 2820-21.) Furthermore, when asked whether Petitioner or his wife ever represented to him that J.A. was homosexual, Lemke denied having received such information. (Id. at 2818-19.)

Petitioner's conclusory assertion that Lemke did not investigate J.A.'s sexual history is contradicted by Lemke's testimony that he attempted to contact J.A.'s ex-girlfriend, to whom J.A. initially disclosed the abuse, but she refused to talk to Lemke or his representative. (Id. at 2823.) Lemke also testified he believed there was information from Facebook that Petitioner and his wife provided to him, but that Lemke did not

inquire whether J.A. was homosexual because he did not have a good faith basis to believe that.  (Id. at 2817-19.)

Based upon the record presented, Petitioner's assertion Lemke did not conduct an inquiry into J.A.'s sexual history is unsupported by anything other than speculation.  Moreover, there is no indication that, had Lemke confronted J.A. regarding his alleged homosexuality, such strategy would have been effective, resulting in a different verdict.  Rather, pursuing that approach could have had negative impacts, e.g., been perceived as biased or homophobic; appearing to engage in victim-blaming; and/or alienating the jury.  Therefore, Lemke's strategic choice on this issue, especially given his testimony regarding same, cannot be said to fall outside the wide range of reasonableness a court is to presume within which an attorney practices.  As such, Petitioner is unable to show Lemke's representation offended Strickland, and this claim fails.

* * *

To the extent not explicitly articulated herein, the Court has considered Petitioner's remaining arguments in support of habeas relief, but finds them to be without merit.

[Remainder of page intentionally left blank.]

<u>CONCLUSION</u>

Accordingly, for all the foregoing reasons, **IT IS HEREBY ORDERED** that the Petition (ECF No. 2) is **DENIED**. The Clerk of the Court is directed to: dismiss the Petition; close the case; and, mail a copy of this Order to Petitioner; and

**IT IS FURTHER ORDERED** that the Court:

I.  Declines to issue a certificate of appealability because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); and

II. Pursuant to 28 U.S.C. § 1915(a)(3), certifies that any appeal from this Order would not be taken in good faith, and, therefore, <u>in forma pauperis</u> status is denied for the purpose of any appeal. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

_/s/_ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:  March 21, 2025
        Central Islip, New York

42